141466 and 1414, I'm sorry, 141466 and 141656, Progressive Casualty versus Liberty. Whenever you're ready. These two appeals have been 14166 and 1656. They have overlapping issues. Many portions of the briefs are similar. Including the procedural issue that we've all been dying to talk about. The procedural issue that we cannot talk about. The issues that we raise, we don't raise claim construction issues, but we raise the obviousness issues and, again, the motivation or reason to complain. So, let's first start with the 14166 appeal, which has the issues for the 970 path. And this deals with actual, excuse me, actuarial processes of insurance and insured profiles. Claims 1, 3 through 6, and by the way, in our blue brief, I believe we misstated 3,6. It should be 3 through 6 in the issues, but we apologize for that. There was a typo. It's claims 1, 3 through 6, 9 to 15 and 18. These claims are not obvious because there's no substantial evidence that the prior act discloses actuarial classes of insurance. And that pair out. And the reason being is that these groupings have to be groupings related to expected loss. That's the construction of an actuarial class. The party's experts agreed that an expected loss is the probability or frequency of an expected claim under an insurance contract due to a covered loss or accident multiplied by the expected claim severity under that insurance contract. So, it has to do with frequency of claims, not just accident risk. That's what these actuarial groupings are. But aren't you underplaying what the phrase related to is in the claim construction? Related to expected loss? Right. So, I mean, if one thing is a function of two variables, it's related to variable number one. Why doesn't that mean that even though the other things like how many claims and the size of the claims, there also are variables that ultimately determine the insurance company's risk and therefore their prices. But those risks and prices are still related to the starting point, which is the driver behavior. Your Honor, I think that would be almost a reductio ad absurdum in the sense that if you say that, for instance, a person's name is related to the expected loss, that's not the kind of group… But that probably isn't. It probably isn't, in fact, that example related to… But you yourself say that the expected loss is ultimately a product of certain things. The items in the product, I mean, the result is clearly related to each item in what you're multiplying. If you look at it that way, it's related to each item separately, but we think the construction was referring to a relatedness to the loss as a whole, not a relatedness to each item separately. And the loss as a whole is the multiple of ten, I guess, is the answer to that equation. I was trying to avoid that word. Did I say that right? I'm never sure what it means. The two elements in the equation, because that would say almost anything could be related to expected loss. But here, the loss has to consider the expected loss. These are actually early groupings, not just based on risk, but based on loss. And that's what the board said. And loss is more than accident risk. Therefore, Herod by itself is insufficient to suggest that there is some type of basis for finding in the prior art any groupings related to expected loss. In fact, the board changed its interpretation, and we think changed it the right way, Your Honor. If you go to the institution decision at A3818, the board had originally said that this type of actuarial class relates to loss, risk, or safety. And the board took out the risk or safety aspects and emphasized that it relates to loss. And so we think that supports the question you had, Judge Serrato, about whether, for instance, risk is sufficient. And that's really the key point here. It's not sufficient anymore. The board has said it's not sufficient, and we agree with the board's claim construction. So each of the combinations that the board made for these claims, 1, 3 through 6, 9 to 15, and 18, relied on Herod and relied on the fact that this accident risk would be a sufficient behavioral grouping to be related to expected loss. But it's not because, again, it misses the probability that a claim would be filed. It's not just that… Lurie's expert, Ms. O'Neill, says that Pazita would know how to calculate expected loss cost, discounting the probability that an insured wouldn't file a claim. She speaks to this at her paragraph 43 and paragraph 47, which are at the appendix. I'm going to turn to that now so I can follow along. A4556 and 57. And if we look at what she said, the first statement is really a rather circular statement. What she says in paragraph 43, and I'm looking at A4557, a Pazita would know that in order to create such behavioral groups relevant to insurance rating… Well, Herod doesn't say that there's any group relevant to insurance rating. An expert can say that, but that's not in Herod as a piece of prior art. And then she goes further to say, which a Pazita would interpret as actuarial classes. But she doesn't say actuarial classes as interpreted by the board. The board said that actuarial classes have to be groupings related to expected loss. And that's not what's discussed here. And then she said would necessarily involve analyzing the data collected in Herod to determine any associated expected loss. This is conclusory speculation drawn with hindsight by looking at Herod. There's nothing in Herod that suggests these groupings would be used for expected loss purposes in order to create insurance premiums. What Herod says about insurance is rather vague. I think the court's probably familiar with it. Herod at A149 simply has a paragraph that says, this information could be of use to vehicle owners and insurers. By the same token, safe drivers would be able to demonstrate their competence to insurance companies. But it doesn't say that there are going to be actuarial classes of insurance based on expected loss that are created as a result of this. That's based on an interpretation of Mrs. O'Neill in her, what we think is a belated declaration. Let's get someone into the procedural part. All of this was so important, it should have been relied on in the petition. And it should have been a basis for them to introduce the evidence at that time, not at a late date in the reply brief, and not at a late date having the board rely upon this testimony to link to a new claim construction. The claim construction the board had this time did not have risk in it. It had expected loss. Herod talks about some type of behavioral groups that may be related to risk. And the board created a new ground for rejection by changing the claim construction and then relying on what was said by O'Neill in respect of Herod as relating to expected loss. The first interpretation by the board was Herod was good enough because it related to accident risk. Now in the final written decision they say Herod is good enough even under their interpretation based on expected loss. So that's a little bit of a problem. That particular notice argument or procedural argument depends on your claim construction argument. You have a separate one having to do with Kosaka which doesn't, is that right? Well, this one, and Kosaka is different, but this doesn't depend on the claim construction. We agree with the claim construction. In other words, it's not that we're asking it to be changed. It depends on our argument relative to the claim construction. I misspoke. I just want to make sure we're in sync on that. And Kosaka is the fuzzy logic which the board has brought up before. And the issue with Kosaka relates to other claims. Herod is our primary discussion for gap-filling on the claims that I just discussed. And if I can finish this quickly, there's also paragraph 49 which is referenced in the O'Neill declaration, and that is similarly insufficient. It says at the bottom of A4559, Posita would recognize that the data collected using the Herod device is used to define actuarial classes. Now here she just says behavioral groups. That's insufficient under the board's construction. And she says based on measured accident risk, again insufficient, arising from observed driving acceleration patterns. So O'Neill's declaration and those two paragraphs are insufficient to fill in the gaps from Herod. And based on the appropriate claim construction, there should not have been the obviousness determination based on Herod. As for Kosaka, that comes into claims 4 through 5 and 16 through 17. And that's the issue of the prepayment amount. The question there is whether Kosaka's so-called prepayment amount is a base cost of insurance. And this is one where there is no significant substantial evidence to suggest that that's anything other than something like a debit card, something like an E-ZPass card, some type of account from which insurance payments could be drawn. But not that it's based on, not that it's a base cost of insurance. It's based on the things we talked about, rating factors, historical data, actual driving conditions, and the like. So without that, there is no base cost of insurance. Kosaka doesn't discuss that this little bank, if you will, this prepayment amount is going to vary among insurers. It's going to vary among people that are using it. It simply says there's a prepayment amount. And the link to make that a base cost of insurance. You mean it's not going to vary among insureds? Insureds, yes. I said the wrong thing, insureds. Okay. Exactly. The question then became on the procedural issue and the new ground. The new ground that we're raising is the ground with respect to Herod in that Herod, because of the claim construction change, was presented as a new ground for rejection by the board, and that was improper. The second, with the fuzzy logic being added, that relates to the evidence that should have been brought in earlier. If the petitioner were suggesting, if Liberty were suggesting that Kosaka's fuzzy logic was something that was known to one of ordinary skill in the insurance industry generally and could be used to be applied in the insurance industry in connection with the type of claim that's set forth here. That information that was brought in at a late date through the O'Neill Declaration and also through four or five different references, dealing with the point not whether fuzzy logic was disclosed in Kosaka, but whether fuzzy logic was well known in the insurance industry. Can I ask, let me just ask or tell you what I'm remembering being concerned about on Kosaka, fuzzy logic, and notice. And maybe this was the earlier case, or maybe it's the same. I took it that you had two types of objections, notice-based objections, regarding Kosaka and fuzzy logic. One is the one I think that you just articulated, that it was improper to allow the kind of evidence and rely on the kind of evidence about what a relevant skilled artisan would understand about fuzzy logic. I want to put that aside. Perhaps that one is sort of within that ambit of the issue of what a skilled artisan would understand was known to you. But I thought you had a separate point. And the board said, oh, we haven't noted this before, but there's a piece of Kosaka that says use insurance tables. Now, that one feels to me intuitively like a quite new ground, which nobody had put you on notice of before. But my problem with that, which I adverted to earlier, was that that's just an alternative ground and it doesn't affect the outcome if the board was right in saying we find a skilled artisan would have known enough about fuzzy logic and how to do it. That makes me curious. The separate point, which the board also articulated, oh, never mind all this fuzzy logic business. It turns out on page three or something of Kosaka, they say you can use insurance tables. Is that a problem? You're right, Your Honor. They do appear to be separate grounds, although they never really developed the common insurance table. They said, yeah, this is a new thing. We're going to throw it out. You can use a common insurance table. We never had a chance to respond to that. And it really depends on which way the court determines is the appropriate ground to decide this case. If it's on common insurance table, it's clearly, as the court said, something we never had a chance to respond to, a total surprise. If it's on fuzzy logic, you have my argument as to why fuzzy logic information is there. Too late and should have been brought sooner. I do want to talk about, I have three minutes or so left, talk about the other appeal, which is very similar, except it deals with Oshard as a primary reference instead of Kosaka. So we don't have the fuzzy logic issue. We have similar arguments with respect to Herod as to the claims that I mentioned before, 1, 3 to 6, 9 to 18. But then with respect to, I'm sorry, 1, 3 to 18 in that one, we also have claims 4, 5, and 16 to 17 that relied on Oshard. And this is where the board really erred in laying out a reason to combine. This is where the board laid out some statements from what they call the Florida Guide that I'm now turning to A7025. This is the language that supposedly gives us the reason to combine. And it says that the Florida Guide tells you you have to create an insured profile. But that's not what the claim talks about. The claims talk about creating a profile and then going further for claim 4, monitoring the vehicle, operator, driving characteristics, etc., etc. You're on your rebuttal time. Sorry. I think you're going to want to save some of that. I've been watching this. I will save for rebuttal. But that's our point that the reason to combine is inappropriate and not clearly laid out and not sufficient. Thank you again. Thank you. Thank you. Mr. Myers. Thank you, Your Honor. May it please the Court. Progressive's arguments here are essentially a repeat of the arguments that they made at the oral hearing. And I recommend taking a look at the transcript. You'll see that it's almost exactly the same, and that's at A5084-5173. They're not entitled to a redo or a substitution or a mulligan. The question here is— I'm confused. I thought it's generally a good thing that litigants coming to this court are making the same arguments they made below. The question presented is whether there's substantial evidence for the board's findings. And that is not what Progressive is arguing. They're arguing for this court to replace the board's determination. There's no claim construction here. So this isn't de novo. They got the claim construction they asked for. The issue is whether or not the Federal Circuit will find that there is substantial evidence, a reasonable basis for the board's fact findings, which leads to the conclusion of obviousness. And it is those fact findings that were made by the board which Progressive contest in the same way they did before the board.  So let's turn to what's the substantial evidence and why this court should be satisfied that the board did a good job. So the first thing that I would say, Your Honor, on this issue of Herod—let me give you a little bit of a background about that reference. What Herod did was it monitored a group of drivers' behavior in the United Kingdom. It determined their acceleration patterns and their speeds. And based on that, it grouped them into behavioral groups based on their acceleration and their speed. And it concluded that they could predict accident risk. The argument that Progressive makes here is essentially there's a disconnect between predicting accident risk and insurance loss. And there are several places where the board disagrees. Let's turn to number one. The Paterson reference itself was a measure and a study which was done in acceleration patterns. And at A7135—and I'm going to read it just a portion of it. Can I just ask you, you started by saying the board disagreed, and I was expecting to hear a citation to something in the board decision. Where did the board specifically agree? The board specifically found that at A7041 that Herod disclosed to Aposita the use of actuarial classes and that it was related to expected loss at 7032-43. I have to stop you. There's too many different pagination numbers. I understand. And this is in the Bouchard one, which is appeal number 14-1656. And I've chosen Bouchard because it covers all the claims. So if you agree with 1656, the 970 patent claims are canceled. I'm sorry, so what was the page then in the board decision in that one? It's in 7041, and then their surrounding discussions in 7032-43. Okay, thank you. And in particular references to Paterson at 7032-37. Now at 7135, what Paterson says is by the fact that the policyholders know that their driving pattern is being controlled and recorded, this will, and I'm dropping a few words, this will reduce driving speed, number of accidents, and consequently also the size of disbursements from the insurance companies. So the link between accidents and payments by the insurance company explicitly in the prior art reference at 7135. Second, the Florida Guide says that insurers charge on a non-discriminatory basis, but one of the basis they can charge on frequency of accidents. And that's at A7164. Now the 970 patent itself says you can create an actuarial class that's predictive of loss based on accident statistics. And that's A7039-43, column 1, lines 28-30. And then based on acceleration data using the claimed invention, and that is A7089, column 641. So the patent itself says you can use acceleration data to create an actuarial class. It says you can use accident statistics to get there. So it's not just Ms. O'Neill's testimony. I would add in addition to the paragraphs that were cited by the progressive in their argument that O'Neill's expert opinion in paragraphs 21 and 22 and 24, and that is A10607-08, makes the statement flat out that you take a look at the actuarial behavior, you put them into groups, that what you then do is determine the accidents, and with the accident information you can make predictions of loss and estimates. And in her rebuttal affidavit she says progressives submitted the actuarial statement of principles. And what I'm talking about doing, making estimates of future loss, is countenanced by the actuarial statement of principles, and that's exactly the job of an actuary, and that is in fact what the board picked up in their decision in A7041. So you have as a basis substantial evidence that Herod discloses an actuarial class that relates to insurance loss. You have Paterson, the Florida Guide, the 970 patent itself, both the old way of doing it, accident statistics in the first columns, the background of the patent, and patterns of acceleration, which was what was used in Herod, using their new invention in column 6. And then you have O'Neill's expert opinion, and all of that information was the basis for the board's decision. Now what the board said ultimately, and with respect to Bouchard, was that given the high level of knowledge of Aposita, and the well-known principles and conventions of insurance, and the expert testimony of Liberty's expert, it was obvious that a person of ordinary skill in the art would do what the law required, and use nondiscriminatory actuarial classes based on an insurance profile with policy limits and deductibles to determine a base cost of insurance. That's at A7025 and at 26. It is also at A702022. And again, that's in the Bouchard final written decision. Now I'd like to turn from the examples, unless there are questions, from the Bouchard to Kosaka, because there are several issues, I think, with respect to Kosaka that deserve some further answer and commentary. The first is the issue of fuzzy logic. And let's turn for a second to that. The board determined two things. One, in both 35A and in 970, that fuzzy logic was well known for insurance. And that's A49 and 970, and A5036 and 37 in 35A. The board also said, excuse me, you don't even have to use fuzzy logic, because if you read Kosaka as a whole, which you should do, you should read the entire reference, it says you don't have to use fuzzy logic. You can use standard insurance lookup tables. That's in A51 and the 970. Is it right that neither the board in its institution decision nor you in your petition ever pointed to the specific passage about insurance tables in Kosaka and said, independent of fuzzy logic, that supplies the required element here? I would say absolutely yes, Your Honor, for the following reason. Prior art is presumed to be enabling. And what it was cited for to make a prima facie case in our petition was to show that Kosaka provided an insurance determination module with sensors on the vehicle that allowed you to make a real-time determination of insurance. The claim language in meeting the claim limitations was in no way related to fuzzy logic. Now what happened was Progressive came back and they said, wait a minute, because of fuzzy logic it won't work. And we said two things in response. One of them was, wait a minute, it was known to use fuzzy logic. And number two, fuzzy logic isn't even required. And at a procedural level, and a reason you should have some trust in the board. I'm sorry, Progressive in its patent on the response said fuzzy logic isn't required in Kosaka? No, no, I'm sorry. Liberty put that in their reply. In the reply, right. And the board agreed. What you need to know as a procedural matter is that Progressive took the depositions of the experts that supported those replies. They were entitled to submit observations and they did not make any motion to do a surreply. They had opportunities to make arguments on these points. Did they have a legal right to submit evidence as perhaps the APA in 556 would suggest they do? Yes. They did? They did. They had the opportunity, one, to make a transfer. After they heard about this? Right. They had the opportunity to cross-examine and depose, which they did. Submit their own? They then had the opportunity. I'm sorry, I think I get to, when I start talking, I think you need to stop and let me, because I sometimes speak a little slowly. I took it as a given that they did not have a right to submit their own new expert declarations, for example, about the factual question of what a relevant, skilled artisan would understand from the newly cited page of Kosaka. They don't as a matter of right, Your Honor. You're correct. They had the opportunity to cross-examine. They had an opportunity, our witnesses, they had an opportunity to make observations about it. They also had the opportunity to approach the board and ask for that opportunity to file expert declarations on the points, and they didn't do it. So they were unable, using cross-examination, they were unable through the observation process to make a dim in the testimony. And in addition, they made no effort to say, we need to have a certify. They didn't present their argument. So where would we be if they had asked for a certify and the board had declined to grant it? Your Honor, I can't predict how the board would have answered it going into the past, but the board has made it clear that if you have a reason for, out of fairness, to get a certify or present some evidence, they regularly allow it and they have over the several thousand cases that are ongoing before the court. Progressive didn't do it. Now I can't predict what would have happened if they had, but they certainly did cross-examine. They did file observations. They even moved to exclude. And the board considered and said, listen, you've got to take the reference as a whole, number one. Number two, you didn't, the issue of enablement here is something that didn't belong in the petition. And then the second piece of it is, this was all proper rebuttal and reply and you should have expected it. I find it difficult to believe that certifies are ever permitted if the board is acting as a firing squad and a death squad. Well, Your Honor, I don't believe that they are. So the board is interested, I believe, in establishing and maintaining a fair procedure. And I don't know if there are more questions about Kosaka. I'm glad to address them, or with respect to Bouchard and the 970. Well, your time is up. It's not quite, but it will be in 20 seconds. All right. Thank you, Your Honor. May it please the court. I'm going to focus on Progressive 1, as I refer to it. That's 1466. In particular, the issue of Kosaka. So when the board adjudicates under 328 the patentability question, it decides, based on the entirety of the record, whether or not those claims are unpatentable. In this particular instance, after a trial was instituted and everybody knew that Kosaka was on the table, Progressive filed a patent owner response that argued multiple things about why Kosaka was not a viable basis for unpatentability, including it's not enabled, it's not consistent with Herod's crisp logic. In the reply, Liberty filed responding declarations that explained why it was, and it pointed out that Kosaka itself undercuts the argument about fuzzy logic, because they're on the face of the document, is the teaching that you don't need to use it. What the APA and due process and everything else requires is that you have notice of the issues of fact of law to be adjudicated. It cannot be said in this case that Progressive did not know that this question about Kosaka and fuzzy logic wasn't on the table because they raised it. There are two questions about Kosaka and fuzzy logic. One is whether a skilled artisan would have known what the heck Kosaka was talking about. Enabled. Enabled. I'm not entirely sure those are the same thing, but let's assume that they're the same thing. The other is whether Kosaka taught not using fuzzy logic. That had not been part of the proceeding before. I took it as given that that proposition, that Kosaka did not require use of fuzzy logic, and a skilled artisan would have understood that, and taken a lesson from the non-fuzzy logic part of Kosaka to start getting motivated to combine things to make this obvious, that that just had not appeared in the proceeding until the reply that Liberty filed. Embedded in your question, Your Honor, is does the statute, the AIA trial statute, require that what the board says in the final written decision in explaining why the claims are or are not unpatentable have been articulated by the board before? And the answer is no. No, I don't think that was embedded. I think what under the APA 554 and probably 556 incorporates what I have trouble thinking of as a different substantive standard from the new ground of decision regulatory standard, that the gist or whatever the language is that is used has to be communicated so that the parties, A, know what they need to address, and B, have an opportunity to put on evidence, including on the factual question here, what Kosaka would mean to a relevant skilled artisan. So, Your Honor, that idea of thrust, the reason why the new grounds doctrine from the examinational model is just not compatible here, the thrust in that context is what did the examiner say before you got to the board for the board to serve its appellate function. This is an examinational model. So that the board, if it says something that goes beyond what the examiner said, which was supposed to be a locked-in basis for why your claims weren't unpatentable, they've exceeded their statutory authority under section six as an appellate body, and it goes back. Here, the thrust to borrow that language from the new grounds law doesn't come until the 328 decision. That's where the board explains, pursuant to its statutory mandate. Right, but I guess what I want to – I just want to be clear. It doesn't matter who gives the patentee the notice, whether it's the petitioner or the board. But if nobody gives the patentee the notice and the opportunity to address what is substantively a different point, there's a real fairness problem about its not having the opportunity to address it. Right, but here they did. That's a different – Final written decision without violating procedural rights. Well, in essence what you're saying is they can rely on the evidence before them. That's correct, Your Honor. And here in particular, and my friend articulated – I'm sorry. Even if nobody had made an assertion about that evidence? Your Honor – Sorry. What – I'm going to think. What 328 says – When you talk about the APA, I don't think 328 repeals the APA. No, it does not. But there's a relationship between the APA issues and 328. What the APA requires is that you have notice of the facts and law before you get to that hearing. And here, clearly the trial record had fleshed out this question of whether or not COSACA requires you to use fuzzy logic. It's on the face of COSACA. It's in the reply. My colleague mentioned some of the things that Progressive tried to do to eliminate that issue before it got to the oral hearing. The one actually they didn't talk about was perhaps maybe the most important one. They tried to exclude that particular material from the trial proceedings. That's to add. In the final written decision, the board adjudicates Progressive's motion to exclude, quote, what Liberty's expert relied upon, new portions of COSACA. It doesn't have to use fuzzy logic. That's an A64, and it rejected it. Notably, Progressive did not pursue an appellate review of that particular aspect of the board's final written decision. They had ample procedural protection on this particular issue. Do you agree with your friend that they should have or could have filed a motion to reconsider or whatever it is, so that they could have submitted new additional evidence if they thought it was necessary? Yes. I'm sorry, Your Honor. Yes, Your Honor. Certain replies are granted in these trials. I mean, under 425, 37 CFR 425, the board has wide latitude to craft how these proceedings move forward to accommodate the various interests. I mean, in some examples... Yeah, but can we be satisfied and guided by the logic that the board appreciates and understands the APA requirements that Judge Taranto is following, so that if they get a motion to supplement or to do a surreply, their evaluation consists of raising the questions about the fairness and the opportunity to respond and so forth? Is that the way this is done? Yes, Your Honor. I mean, for example, just to give an example. In one IPR, 2013, 00063, the board permitted a surreply on the question of anti-gating priorities. They gave the patent owner an example or the option to file a surreply to respond on the priority issue. I mean, there are examples across all of these IPRs and covered business method patents and PGRs. Suffice it to say, if the board is confronted with this particular issue and the board says, no, no surreply, that's an issue that this court can review because it ultimately flows into the 328 final written decision. But I think it is fair to say— Well, they did the cousin of a surreply. They moved to strike, and you've already acknowledged to us that they're not going to appeal a denial of motion to strike. Why isn't the same case of denying a surreply? Your Honor, I think that's—I recognize what you're saying. I think it's a long way of saying that there are multiple avenues available to a patent owner to pursue in these proceedings, some expressly enumerated in the regulations, some not but available to you to ask for. One that nobody's mentioned is the fact that pursuant to 42300B, the board can extend these proceedings by six months pursuant to the statutory authority in the AIA. That was not something they pursued. Maybe that's something they didn't ask for a rehearing of the final written decision. Did the regulation—whatever you cited, did that provide certain grounds for extending it over six months? It's good cause. Good cause, Your Honor. So this is all—and I apologize. I see I'm way past my time. But this is all a long way of saying there's any number of things that a party like Progressive can use. Some of them they did. Some of them they didn't, but are all sufficient to protect under the APA and the due process clause. Thank you. Thank you. Well, this is not moving on as rapidly as I had hoped, but here we are. I'll make this very short as I have very little time. We think that at the very least, these appeals should be remanded to the board for proper proceedings due to the late filing and late new grounds that were added both on the Herod reference in the change in the claim construction as well as the fuzzy logic in the common insurance table issue. If the board—or the court, on the other hand, decides that there is not sufficient substantial evidence to show that Herod has the so-called actuarial class of insurance relating to expected loss, that would be sufficient in itself, and I'll remand for a reversal. The same would be true in terms of Kosaka as it relates to the prepayment calculation. Are there no further questions? Thank you. Okay. Thank you. The case is submitted.